# HAYSSEN COMPANY SOUTHERN, Appellant, v. DONELSON & POSTON, INC., Appellee.—364 S.W. (2d) 489.

Western Section at Jackson. August 30, 1962.

Certiorari Denied by Supreme Court December 7, 1962.

Daniel D. Canale, Memphis, Robert L. Rohde, Sheboygan, Wis. Montedonico, Boone, Gilliland, Heiskell & Loch, Memphis, Federer, Grote, Hesslink, Rohde & Neuses, Sheboygan, Wis., of counsel, for appellant.

Donelson, Adams, O'Hearn, Grogan & Edwards, Memphis, for appellee.

CARNEY, J. The complainant below, Hayssen Company Southern, a Georgia corporation, which is the sales corporation for its parent company, the Hayssen Manufacturing Company, filed an original bill in the Chancery Court of Shelby County seeking recovery of the sum of $7,275.70 as the remainder of the purchase price of a Model "G" Compak packaging machine. The total contract purchase price was $9,190.00.

The Chancellor allowed the defendant appellee, Donelson & Poston, Inc., a recovery of $2,627.50 on its cross-bill as damages for breach of warranty because the machine failed to produce commercially acceptable packages of beans. The Court then entered a decree allowing

the appellant a net recovery of only $4,992.26 and assessed all the costs of the cause against the complainant. The complainant has appealed from the action of the Chancellor in sustaining the defendant's cross-bill and allowing a recovery of damages for failure of the machine to produce commercially acceptable packages of beans.

The determinative question before the Court below and before this Court on appeal is the applicability of a "no damage clause" or provision of the contract contained in the warranty paragraph of the contract.

The material provisions of the contract are as follows:

"HAYSSEN COMPANY SOUTHERN No. 2651

"City Memphis County Shelby State Tennessee Date 1/11/60

"To: HAYSSEN COMPANY SOUTHERN, Sheboygan, Wisconsin, (hereinafter designated 'Company')

"I or we Donelson & Poston, Inc. of 625 S. Front Street, Memphis,
(Name of Buyer) (Street) (City)

Tennessee having been quoted both a time and a cash price hereby
(State)

time

purchase from you on a cash basis the following described personal property f.o.b.

Sheboygan, via BEST at the risk of buyer during shipment:

"DESCRIPTION OF MACHINE

"One Hayssen Model G Compak, complete with 4 cup

volumetric feed, electric eye and polyethylene

attachment to give flush cut cold wire cutoff

and equipped with 2⅝" diameter seam seal

assembly and 3" seam seal assembly but without

Air compressor. $9190

Installation by Factory Engineer . . . $15.00 per day.

Supersedes contract 4157.

for which buyer agrees to pay you o'r your assigns the sum of $9190.00
(Full Contract Time Price)
payable as follows: $ 1,000.00 on the date hereof, $ 1,190.00 prior
(Down Payment)
to delivery of above property, and the balance of $ 7,000.00 in 30 days
net * * *.

"No agent or salesman of the Company has authority to change any of the conditions, provisions or covenants of this agreement. Orders are not subject to cancellation, except upon payment by the buyer of 25% of the purchase price. All orders are subject to acceptance by the Company at its home office and accepted subject to accidents, strikes or unavoidable delays.

"WARRANTY: The Company warrants that the equipment sold hereunder will be constructed in accordance with the attached specifications, and that when properly installed and operated according to its instructions will produce commercially acceptable packages. In no event does the Company assume any liability for any damages which the buyer may claim to have sustained by reason of the failure of said machine to perform satisfactorily.

"GUARANTEE: The Company guarantees the equipment against mechanical imperfections and defects for a period of one year from the date of installation. Its obligation under this guarantee is limited to replacing at its factory any part or parts which prove to be defective upon examination by the Company.

"IT IS FURTHER AGREED AND UNDERSTOOD between the parties hereto that no further warranty or representation, oral or written, express or implied, except as above specified, has been given to the buyer."

The parties had entered into a prior contract on December 9, 1959, which provided for installment payments but by mutual consent the new contract was entered into on January 11, 1960, providing for a cash price of $9,190.00 as above set out.

The defendant firm of Donelson & Poston, Inc., has been engaged in Memphis, Tennessee, as fruit brokers since 1881. About 1950 the firm entered the food packaging field. A considerable portion of its business consists of going into the producing areas and buying dried beans. The beans are then brought to Memphis where they are packaged in small units of four ounces, six ounces, ten ounces, one pound, two pounds, etc. and later resold throughout the southeastern portion of the country to wholesalers and/or retailers.

At the time of the purchase of the Model ''G'' Compak machine the defendant, Donelson & Poston, Inc., was already using a Model ''F'' Compak packaging machine which it had purchased from the complainant. The Model ''F'' machine is very similar to the Model ''G'' Compak machine. Two main differences between the two machines are; one, the Model ''F'' machine has two tubes for the packaging of materials whereas the Model ''G'' has only one tube. The Model ''F'' machine can put out two packages of the same material or of different materials at the same time whereas the Model ''G'' can only put out one package at a time. Another difference is the Model ''F'' machine was furnished with a knife cut-off whereas the Model ''G'' machine was ordered with a cold wire flush cut-off.

A knife cut-off, as the name implies, leaves a tab or fin of the polyethelene material at each end of the bag. The other type of cut-off known as a wire or flush cut-off utilizes a wire device which melts or cuts through the polyethelene material and seals each end of the package so as not to leave any excess film material extending beyond the seal.

Mr. William C. Donelson, vice-president of Donelson & Poston, Inc., testified that his firm decided to purchase the second machine with a wire flush cut-off for two principal reasons: One, it made a much neater package and therefore was more acceptable to the trade; and second, about ⅛ inch of film or polyethelene material was saved off each end of each bag by the flush cut-off resulting in a saving of approximately $2,000.00 per year for his firm. Both the Model "F" Compak machine and the Model "G" Compak machine were designed and built so as to use either the knife cut-off or the wire flush cut-off. After the purchase of the Model "G" Compak machine, Donelson & Poston, Inc., had the Model "F" machine converted to a flush wire cut-off.

The case was tried before the Chancellor without a jury. The defendant introduced proof which showed that the installation of the machine by complainant's employees was completed on February 29, 1960, and the defendant was assured that the machine was producing commercially acceptable packages of beans for all sizes except four ounce bags. Defendant also introduced proof showing that a great many packages of beans were sent out to its customers and the bags began to break at or near the seams and the defendant had to repossess large amounts of these beans during the period from February 29, 1960, to April 14, 1960. Complainant's employees on April 14, 1960, were finally able to get the machine working properly and producing commercially acceptable packages of beans by changing the machine from a cold wire flush cut-off to a hot wire flush cut-off. Since April 14, 1960, the machine has been performing satisfactorily in every way and the defendant is entirely satisfied with the machine which is now being used by it.

It was the insistence of the complainant that the machine was never completely and finally installed until April 14, 1960, as indicated by the signed receipt of Mr. Donelson, vice-president of the defendant corporation. Further it was the insistence of the complainant that the changing from a cold wire cut-off to a hot wire cut-off was in fact not a major alteration of the machine but only a minor adjustment. The complainant further insisted that the thickness and quality of the polyethelene film varied slightly according to manufacturer and cut-off on the machine had to be adjusted to the particular film being used.

There seems to be no real dispute that the defendant customer did sustain considerable loss by having to take up many packages of beans which it had sent to its customers during the period from February 29, 1960, to April 14, 1960. The defendant alleged a total of $3,186.51 in damages. The Chancellor allowed only $2,627.50 and there is no appeal by the defendant from this amount. Also the Chancellor found that the damages sustained by the defendant proximately accrued from the failure of the machine to produce commercially acceptable packages.

The Chancellor found no fraud or overreaching by any of the parties.

■ On April 5, 1960, the parent company, Hayssen Manufacturing Company, which manufactured the machine wrote the defendant stating that on March 21, 1960, a request had been made for payment of the balance due on the machine. The defendant's vice-president, Mr. W. C. Donelson, wrote a memorandum on the bottom of the letter in reply: ''So far have not been able to get the

machine to perform satisfactorily. When we have satisfactory operation, will send check.'' Apparently the complainant company considered that the installation of the machine had been completed on February 29 since it mailed a bill or statement on March 21, 1960. Hence, we affirm the holding of the Chancellor that the installation was completed on February 29, 1960, and that thereafter there was a breach of the express warranty that the machine when properly installed would produce commercially acceptable packages.

Thus it appears that the only substantial defense which the complainant has to the cross-bill is the ''no damage clause'' contained in its contract, namely, ''In no event does the company assume any liability for any damages which the buyer may claim to have sustained by reason of the failure of said machine to perform satisfactorily.''

The Chancellor held the ''no damage clause'' inapplicable as a defense to the cross-bill because it did not give the buyer any effective remedy for breach of warranty in lieu of damages nor limit the rights of the buyer to specific remedy. He said in effect the complainant had made an express warranty and in the next breath had excluded the protected party from the benefits of the warranty. The Chancellor was of opinion that a reasonable construction of the ''no damage clause'' would confine its applicability to damages other than those arising from the failure of the machine to produce commercially acceptable packages. On petition to rehear the Chancellor found the ''no damage clause'' ambiguous.

By appropriate assignments of error the complainant has assailed the action of His Honor the Chancellor in holding that the ''no damage clause'' of the contract was not available to the complainant as a defense to the

cross-bill. Our Tennessee Courts do not seem to have passed upon this question.

In the recent case of Moss v. Fortune (1959), 207 Tenn. 426, 340 S.W.(2d) 902, the plaintiff was injured while riding a horse rented from the defendant riding academy. The stirrup strap broke suddenly throwing the plaintiff to the ground and seriously injuring him. Plaintiff brought suit against the riding academy alleging negligence in furnishing him with defective equipment. The defendant filed a plea that the plaintiff had voluntarily assumed the risk of injury incident to riding the horse and relied upon a written agreement signed by the plaintiff. The agreement was as follows:

"Fortune's Tropical Gardens

"I am hiring your horse to ride today and all future rides at my own risk.

"Signed Morris Moss"

The case went to the Supreme Court upon a demurrer and the Supreme Court upheld the action of the Trial Judge in dismissing plaintiff's suit. From the opinion of Judge Felts we quote as follows:

"It is well settled in this State that parties may contract that one shall not be liable for his negligence to another but that such other shall assume the risk incident to such negligence. Cincinnati, New Orleans & Texas Pacific Ry. Co. v. Saulsbury, 115 Tenn. 402, 90 S.W. 624; Carolina, C. & O. R. R. Co. v. Unaka Springs Lumber Co., 130 Tenn. 354, 170 S.W. 591; McKay v. Louisville & Northern R. R. Co., 133 Tenn. 590, 182 S.W. 874; Robinson v. Tate, 34 Tenn.App. 215, 236 S.W.(2d) 445.

"To this general rule there are some exceptions, not here material. For instance, a common carrier may not, by contract, exempt itself from liability for a breach of duty imposed on it for the benefit of the public; and a railroad cannot by contract exempt itself from liability 'from willful or gross negligence in running over a slave, asleep on the track.' Memphis & Charleston R. R. Co. v. Jones, 39 Tenn. 517. See review of the cases by Judge Swepston in Robinson v. Tate, supra, 34 Tenn.App. 226-230, 236 S.W. (2d) 445."

The appellant cites and relies upon three cases dealing with no damage clauses from foreign jurisdictions: Bechtold Heating Service v. Murray-Ohio Manufacturing Co., 321 Pa. 423, 184 A. 49; Nelson v. Swedish Hospital, 241 Minn. 551, 64 N.W.(2d) 38; Martin v. Southern Engine and Pump Co., Tex.Civ.App., 130 S.W. (2d) 1065.

In the Bechtold case the plaintiff purchased some 300 stokers for heating a series of houses. The contract between the purchaser Bechtold and the defendant seller, Murray-Ohio Company, contained the following provision:

"(a) 'Murray-Ohio guarantees that all apparatus shipped under this agreement will be free from defects in workmanship and material on normal use and service, and the obligations of Murray-Ohio under this guaranty is limited to making good, at the place of manufacture, any part or parts of apparatus which shall, within one (1) year from the date of shipment, be returned to Murray-Ohio at the place of manufacture and there ascertained by Murray-Ohio to be defective in workmanship or material.'

"(b) 'Murray-Ohio warrants that said Hannon Stokers, when properly installed and regulated, will at the time of initial installation perform the functions of an automatic stoker with blower, and the obligation of Murray-Ohio under this guaranty shall be limited to the adjustment or replacement of any part necessary to make the same, upon such installation, operate as a unit.'

"(c) 'Except as to the obligations set forth in paragraph IX hereof relating to its obligations with respect to patent infringement, the foregoing guaranty and warranty are expressly made and accepted in lieu of all other guaranties, warranties, obligations, or liabilities, expressed or implied, by Murray-Ohio, and no claim for damages or labor sustained by the Purchaser on account of defective apparatus or otherwise, will be allowed by Murray-Ohio.' "

The stokers were furnished according to the sample but gave unsatisfactory performance. The plaintiff purchaser sought to return the stokers to the seller who refused to accept them. Thereupon the plaintiff brought suit for breach of warranty under the uniform sales act.

In upholding the contention of the defendant seller and the validity of the "no damage clause" the Supreme Court of Pennsylvania said as follows:

"Unless parties stipulate otherwise, the Uniform Sales Act of 1915, supra, governs the sale. Here the parties made their own agreement. Section 71, 69 P.S. sec. 32, provides: 'Where any right, duty, or liability would arise under a contract to sell or a sale, by implication of law, it may be negatived or varied by express agreement or by the course of dealing

between the parties, or by custom, if the custom be such as to bind both parties to the contract or sale.' The seller avers that it has performed its contract as to such machines as were ordered and received by defendant. Appellant, on the other hand, asserts that, notwithstanding the no-damage clause, it may recover under section 69 (6) of the act, 69 P.S. sec. 314(6), providing that 'the measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty.' It is not suggested that the transaction is affected by fraud or mistake. The parties agree that they said what they meant. Both parties and their counsel participated in stating the terms of the contract. The seller says that it has performed, but, if it has not done so in the respect complained of, the buyer has agreed that he shall have no right to recover damages. What did they mean by paragraph (c) modifying or supplementing paragraphs (a) and (b)? If unwilling to take the risk that the machine might not do what he wished to do with it, the buyer should not have stipulated, as he did, that if it failed in that respect, he should recover no damages. Section 69 of the Sales Act (69 P.S. sec. 314) provides the possible remedies for breach of warranty, in substance, the right to sue for consequential damages, or the right to rescind and recover back the purchase money. These parties, by their agreement, eliminated one of these remedies. We need express no opinion on appellant's suggestion that if the seller had brought suit for the purchase price, the defense of breach of warranty would have prevented recovery (for which cases from other

jurisdictions said to support his view are cited). Nor is appellant aided by cases (like Mayfield v. George O. Richardson Machinery Co., 208 Mo.App. 206, 231 S.W. 288, cited) in which the clause restricting damage was less comprehensive than that involved.

"The suit, as we have said, is on the contract. No reason why plaintiff is not bound by its terms has been shown. In Hill & MacMillan, Inc., v. Taylor, 304 Pa. 18, 155 A. 103, 104, 75 A.L.R. 1022, the seller sued for the purchase price of a gas engine sold under a contract providing that the seller would 'replace, on order without charge, any defective part within three months from date of shipment, provided examination proves the claim, and the purchaser agrees that no other claim for loss or damage of any description will be made against Hill & MacMillan, Inc.' The buyer defended on the ground of breach of warranty; we held that the agreement of the parties had made the defense unavailable, saying: 'There would be much merit in the third defense were it not for the fact that the written contract between the parties provides a procedure that must be followed when there is a defective part.' * * *

"The judgment is affirmed."

In this case the learned Chancellor indicated that the "no damage clause" might have been an effective defense to the defendant's cross-action if the no damage clause had contained a statement showing just what remedies for breach of warranty were left to the purchaser.

 We respectfully disagree with His Honor the Chancellor and are of opinion that the wording of the no damage clause was clear and unambiguous. The parties were both sui juris and there is no fraud or overreaching proven. In the same clause which warrants the machine to produce commercially acceptable packages the parties agreed in writing that the complainant company seller would not be liable for damages for the failure of the machine to perform satisfactorily. Failure to perform satisfactorily would certainly include failure to produce commercially acceptable packages. In our opinion the no damage clause in the instant case is not contradictory to or inconsistent with the warranty contained in the same paragraph but is only restrictive of the rights of the purchaser under the warranty.

 Under our Uniform Sales Act, T.C.A. sec. 47-1269 a buyer is given several options in case of a breach of warranty by the seller. All of these rights are left to the buyer in the present cause under the present contract except the defendant contracted away its right to claim damages for the failure of the machine to produce commercially acceptable packages or to perform satisfactorily. Under the warranty as restricted the purchaser could have refused to pay for the machine until it was producing commercially acceptable packages. It is significant to note that the vice-president of the defendant, Donelson & Poston, Inc., exercised this right in his reply to the letter from complainant written on April 5, 1960.

Our holding, we think, is consistent with the general rule announced in 46 Am.Jur. Sales, Section 712, page 836:

"712. Provisions of Contract.—The parties to a sales contract may by express stipulation limit the

liability of the seller on his warranty, either as to the remedy or as to the conditions precedent to any accrual of rights thereunder, and effect will be given by the courts to such a limitation. The parties to such a contract may provide the remedy that shall be pursued by the buyer in case of breach of the condition or warranty, and make that remedy the only one available to him, and in that event, they are limited to and bound by the remedy thus provided, in the absence of a waiver thereof by the seller. Thus, the buyer may be restricted to a right to return the article, or be required to give notice of the breach as a condition precedent to the accrual of any right to claim damages or other relief therefor.''

The assignments of error will be sustained. The action of His Honor the Chancellor awarding the defendant a judgment upon its cross-action will be reversed. A decree will be entered in this cause in favor of the complainant consistent with the above. The costs will be taxed against the appellee.

Avery, (P. J. W. S.), and Bejach, J., concur.